William B. DEMPSEY,
et al., Plaintiffs,

v.

The CITY OF BALDWIN CITY,
KANSAS, Defendant.

No. CIV.A. 03–2009–CM.

United States District Court,
D. Kansas.

Aug. 17, 2004.

Ira Dennis Hawver, Ozawkie, KS, for Plaintiffs.

Donald Patterson, Fisher, Patterson, Sayler & Smith, Topeka, KS, Robert L. Bezek, Jr., Bezek, Lowry & Hendrix, Ottawa, KS, for Defendant.

## MEMORANDUM AND ORDER

MURGUIA, District Judge.

Plaintiffs William B. Dempsey (Dempsey), Eric J. Garcia (Garcia), Charles W. Hensley, II (Hensley), and Charles R. Woolsoncroft (Woolsoncroft) (collectively plaintiffs) brought this action on January 7, 2003, under 42 U.S.C. § 1983, alleging defendants the City of Baldwin City, Kansas (the City), the Mayor, the City Administrator, and the City Council of the City of Baldwin City, Kansas (the Council), engaged in a pattern and practice of retaliation against plaintiffs for exercising their rights under the First and Fourteenth Amendments while they served as police officers for the City's Police Department. Plaintiffs also brought defamation and intentional infliction of emotional distress claims under Kansas law.

During the parties' pretrial conference, held on November 21, 2003, and in the subsequent Pretrial Order (Doc. 52), entered on December 11, 2003, the parties stipulated to the dismissal, with prejudice, of all plaintiffs' claims against three of the defendants—the Mayor, the City Administrator, and the Council. It also appears that plaintiffs abandoned their intentional infliction of emotional distress claim. Pursuant to the Pretrial Order, plaintiffs' remaining claims are their First and Fourteenth Amendment claims under 42 U.S.C. § 1983, and their defamation claim under Kansas law.[1]

This matter comes before the court on the remaining defendant, the City's Motion for Summary Judgment (Doc. 53) on plaintiffs' 42 U.S.C. § 1983 claims, defamation claim, and request for injunctive relief. As

---

1. The Pretrial Order supercedes all prior pleadings, establishes the issues to be considered at trial, and controls "the subsequent course of the action unless modified by a subsequent order." Fed.R.Civ.P. 16(e); *Wilson v. Muckala,* 303 F.3d 1207, 1215–16 (10th Cir.2002).

set forth below, defendant's motion is granted.

## I. Summary Judgment Standard

Summary judgment is appropriate if the moving party demonstrates that there is "no genuine issue as to any material fact" and that it is "entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). In applying this standard, the court views the evidence and all reasonable inferences therefrom in the light most favorable to the nonmoving party. *Adler v. Wal–Mart Stores, Inc.*, 144 F.3d 664, 670 (10th Cir. 1998) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986)). A fact is "material" if, under the applicable substantive law, it is "essential to the proper disposition of the claim." *Id.* (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)). An issue of fact is "genuine" if "there is sufficient evidence on each side so that a rational trier of fact could resolve the issue either way." *Id.* (citing *Anderson*, 477 U.S. at 248, 106 S.Ct. 2505).

The moving party bears the initial burden of demonstrating an absence of a genuine issue of material fact and entitlement to judgment as a matter of law. *Id.* at 670–71. In attempting to meet that standard, a movant that does not bear the ultimate burden of persuasion at trial need not negate the other party's claim; rather, the movant need simply point out to the court a lack of evidence for the other party on an essential element of that party's claim. *Id.* at 671 (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)).

Once the movant has met this initial burden, the burden shifts to the nonmoving party to "set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 256, 106 S.Ct. 2505; *see Adler*, 144 F.3d at 671 n. 1 (concerning shifting burdens on summary judgment). The nonmoving party may not simply rest upon its pleadings to satisfy its burden. *Anderson*, 477 U.S. at 256, 106 S.Ct. 2505. Rather, the nonmoving party must "set forth specific facts that would be admissible in evidence in the event of trial from which a rational trier of fact could find for the nonmovant." *Adler*, 144 F.3d at 671. "To accomplish this, the facts must be identified by reference to affidavits, deposition transcripts, or specific exhibits incorporated therein." *Id.*

Finally, the court notes that summary judgment is not a "disfavored procedural shortcut," rather, it is an important procedure "designed to secure the just, speedy and inexpensive determination of every action." *Celotex*, 477 U.S. at 327, 106 S.Ct. 2548 (quoting Fed.R.Civ.P. 1).

## II. Facts

### A. Procedural Issues

As a preliminary matter, the court notes that plaintiffs Dempsey, Garcia, and Woolsoncroft submitted extensive affidavits in response to the Motion for Summary Judgment. The City argues that the affidavits should be stricken. In essence, the City contends that these affidavits contain improper opinions and conclusions, that each affiant has failed to establish personal knowledge of the facts to which they attest, and that, in several instances, the facts in the affidavits are not material for summary judgment purposes. The City also argues that the affidavits contradict plaintiffs' prior deposition testimony in an attempt to create sham issues of fact, despite the fact that plaintiffs did not make any corrections to their deposition transcripts. The City also argues that the affidavits do not provide record support for the facts asserted by plaintiffs as is required to overcome a motion for summary judgment.

■ In determining whether to consider plaintiffs' affidavits, the court notes that contradictions found in a witness's testimony are not, in themselves, sufficient to preclude such testimony. *Ralston v. Smith & Nephew Richards, Inc.*, 275 F.3d 965, 973 (10th Cir.2001). Indeed, "in determining whether a material issue of fact exists, an affidavit may not be disregarded [merely] because it conflicts with the affiant's prior sworn statements." *Franks v. Nimmo*, 796 F.2d 1230, 1237 (10th Cir. 1986). However, in assessing a conflict under these circumstances, "courts will disregard a contrary affidavit when they conclude that it constitutes an attempt to create a sham fact issue." *Id.* Factors relevant to the existence of a sham fact issue include whether the affiant was cross-examined during his earlier testimony, whether the affiant had access to the pertinent evidence at the time of his earlier testimony or whether the affidavit was based on newly discovered evidence, and whether the earlier testimony reflects confusion which the affidavit attempts to explain. *Id.*

The court concludes that portions of Garcia's, Dempsey's, and Woolsoncroft's affidavits directly contradict their prior deposition testimony, contain facts not material to the motion for summary judgment, fail to establish personal knowledge to some of the facts attested, and fail to provide record support for the facts asserted. However, portions of the affidavits also cite directly to deposition testimony and other documents that are part of the discovery record. Moreover, many of the statements in the affidavits are consistent with plaintiffs' positions and prior statements throughout the lawsuit. Therefore, the court will not strike the affidavits in their entirety, but will, instead, simply disregard those portions not based upon personal knowledge, those portions containing improper conclusions, those portions containing facts immaterial

to the motion for summary judgment, and those portions not otherwise supported with reference to the record. *Trestle & Tower Eng'g, Inc. v. Star Ins. Co.*, 13 F.Supp.2d 1166, 1167 (D.Kan.1998).

■ The court also notes that plaintiffs' response brief fails to adequately respond to the City's statement of facts. Plaintiffs begin their fact section with several paragraphs that summarily oppose the City's statement of facts without citing to any evidentiary support. Plaintiffs then present a separate statement of facts, at times noting a paragraph in the City's brief to which they are responding, often without providing evidentiary support other than a cite to one of the plaintiffs' affidavits. Local Rule 56.1 requires that "[e]ach fact in dispute shall be numbered by paragraph, shall refer with particularity to those portions of the record upon which the opposing party relies and, if applicable, shall state the number of the movant's fact that is disputed." D. Kan. Rule 56.1(b)(1). Plaintiffs have failed to comply with these requirements. Thus, where allegedly disputed facts are not directly controverted by evidence contained in the record, the court considers those facts uncontroverted pursuant to Fed.R.Civ.P. 56. However, the court will deem the City's facts controverted to the extent that plaintiffs' own facts fairly meet the substance of the City's statement of facts and are supported by competent evidence.

Finally, the court notes that it construes the facts in the light most favorable to plaintiffs as the non-moving party pursuant to Federal Rule of Civil Procedure 56.

**B. Organization/Policies of the City**

During the time period relevant to plaintiffs' lawsuit, the City was a City of the Third Class under Kansas law which adopted the Strong Mayor/City Council form of government, as modified by a

charter ordinance. Kan. Stat. Ann. § 15–301 permits the City's Mayor to preside at all meetings of the Council, but permits the Mayor to vote as a member of the Council only when the Council is equally divided. At all times relevant to this lawsuit, the Council was comprised of five members.

Kan. Stat. Ann. § 15–204 permits the Mayor to appoint a municipal judge, a clerk, a treasurer, a chief of police, law enforcement officers, and other officers as necessary. While duties and pay of those appointed officers are regulated by ordinance, the Mayor may suspend any of the elected officials. The Council may, by majority vote, remove any appointed officer from his position.

The City's ordinances permit the adoption of uniform personnel rules. In November 1990, the Council adopted by ordinance Uniform Personnel Rules and Regulations (the City's Rules and Regulations). The City's Rules and Regulations do not create contractual employment rights for employees. *See* Article A–1(e).

Article A–3 of the City's Rules and Regulations authorizes the head of each of the City's departments to adopt written rules and regulations for the conduct of the operations of each department, so long as the department's regulations do not conflict with the City's Rules and Regulations.

Articles G–1 and G–2 of the City's Rules and Regulations also authorize department heads to discipline employees for violating the City's Rules and Regulations, for violating any department regulations, for engaging in conduct that discredits the City or hinders the effectiveness and efficiency of the City's operations, and for engaging in general misconduct. Under Article G–5, general misconduct includes, but is not limited to: conviction of a violation of any city, state or federal law; failure to follow prescribed safety procedures including

failure to notify his or her supervisor of unsafe working conditions; violation of personnel or departmental rules and regulations; incompetency, inefficiency or insubordination in the performance of assigned duties; and discourteous, disruptive or offensive behavior. Under the City's Rules and Regulations, the City's Administrator also has authority to implement disciplinary action, subject to the grievance procedure provided in the City's Rules and Regulations.

Pursuant to Article G–3, discipline may involve a verbal warning, a written reprimand, probation, salary reduction, demotion, suspension from service with or without pay, or termination of employment. Article G–6 contains examples of serious misconduct for which an employee may be immediately terminated—following notice to the employee and an opportunity to have a hearing. However, according to Article G–4, discipline more severe than a verbal warning must be approved by the City's Administrator. An employee is to be notified of his right to file a grievance at the time discipline is implemented pursuant to Article H of the City's Rules and Regulations.

Article H of the City's Rules and Regulations sets out the grievance procedure. Article H–1 explains that:

Any employee has the right to present a complaint or grievance concerning his or her job, working conditions, salary, relationship between employees and co-workers, supervisor, or departmental head, the application of equal employment opportunity policies, or as an appeal or [sic] any disciplinary action taken pursuant to these rules. A sincere attempt should be made by each employee and supervisor to resolve any grievance before it becomes necessary to resort to the grievance procedure.

Pursuant to Article H–2(a), "any complaint or grievance shall initially be filed by the employee with his or her supervisor." Section H–2(b) of the City's Rules and Regulations provides:

If the employee disagrees with the decision of the supervisor, the employee may forward the complaint or grievance in writing to his or her department head .... If the employee's supervisor is the department head, then the complaint may be forwarded to the City Administrator after failure to resolve the complaint. If the complaint or grievance cannot be satisfied by the City Administrator, the employee may forward his or her written complaint within seven working days to a grievance committee by filing his or her appeal with the City Administrator.

According to Article H–2(c), the grievance committee is comprised of the City's Administrator, a supervisor or department head appointed to the committee by the Mayor, and a non-supervisory employee. After a decision by the grievance committee, the employee may appeal the decision directly to the Council by filing a written notice with the City's Administrator. Pursuant to Article H–4, a decision by the Council on an appeal is final.

## C. Police Department Policies

Pursuant to the City's Rules and Regulations, the City's Police Department adopted Police Department Policies. Section 2.035 of the Police Department Policies notes that:

It shall be the duty of all supervisors and employees to take corrective action and/or promptly submit a written report to the Chief through channels whenever they, through personal observation or report, learn of any violation of the rules and regulations, personnel rules, and/or

the laws of the State of Kansas or the United States.

Section 2.105 states in pertinent part:

Any employee obtaining or receiving, or having knowledge of any criminal act, or information of any criminal activity, shall immediately report the information to the appropriate division or section or the employee's supervisor of the Police Department.

Section 2.030 of the Police Department Policies states that disciplinary action under the Police Department Policies will be in accordance with the City's Rules and Regulations.

Section 17.000 of the Police Department Policies also sets forth a chain of command. In the chain of command, patrol officers are supervised by a detective or corporal, who reports to a sergeant or the Assistant Chief, who reports to the Chief of Police. According to Section 17.005, the Chief of Police is directly responsible to the City's Administrator, the Mayor, and the Council for actions taken by the Police Department.

## D. Composition of the Police Department

From 1999 until July 2003, the Police Department had two different chiefs: first Steve Butell (Butell) and second, Mike McKenna (McKenna), who was hired in December 2002. It also appears from the record that the Assistant Chief, Sergeant Colleen Larson (Larson), served as an interim chief in 2002, between Butell's termination and McKenna's hiring. The Police Department had one Corporal, Dempsey. The City also employed four patrolmen: Woolsoncroft, Hensley, Garcia and G.H. Jaych Rhea (Rhea). Butell and Larson determined the composition of officers' shifts and their rotation. Dempsey was the immediate supervisor of the patrolmen.

Dempsey, Garcia, and Hensley were hired as at-will employees, terminable at any time, without any contractual claim to continued employment. Apparently, Woolsoncroft signed a contract to work for the City for three years.[2]

### E. Problems with Officer Rhea

From August 2000 until July 6, 2001, Garcia, Woolsoncroft, and Rhea lived together in an apartment. Woolsoncroft had an opportunity to observe inappropriate behavior and criminal conduct by Rhea at home and at work, including:

- Rhea giving liquor to minors in the apartment.
- Rhea's misuse of the Triple I system, which is the interstate identification index by which police officers can determine whether or not a suspect has any criminal background. Only Butell, Larson, and Dempsey had authority to authorize the use of the Triple I system. Woolsoncroft heard Rhea use the Triple I system to investigate the boyfriend of a daughter of a friend of his who was not a criminal suspect.
- Rhea using alcohol excessively.
- Rhea coming into the apartment drunk after driving his vehicle, although Woolsoncroft did not actually see Rhea driving while he was drunk.
- Rhea admitting to Woolsoncroft that he had smoked marijuana with unidentified minors.
- Rhea using excessive force against a suspect after Garcia had sprayed the suspect with pepper spray.

Additionally, Hensley and Garcia reported to Woolsoncroft that, after returning from an incident at work on March 7 or 8, 2001, Rhea kissed his shotgun and apologized to it for not using it to shoot anyone.

Garcia also observed Rhea serving alcohol to minors. Although he did not personally observe any of the other behavior that Woolsoncroft reported, he was aware of it by talking to Woolsoncroft. Hensley did not personally observe any criminal behavior by Rhea, but heard the allegations from Woolsoncroft and Garcia.

### F. Reports Regarding Rhea's Conduct

In March 2001, after hearing informal oral reports from Hensley, Garcia and Woolsoncroft regarding Rhea's behavior, Dempsey told each officer to prepare written reports. Hensley, Garcia, and Woolsoncroft each prepared written reports, signed and dated March 12, 2001, detailing their observations of Rhea, incidents that had occurred, violations of Police Department Policies by Rhea, their concerns about Rhea as a police officer, and concerns about their own safety and the safety of the community with Rhea acting as a police officer. Hensley, Garcia, and Woolsoncroft delivered the reports to Dempsey, who in turn delivered them to Butell and Larson.

Shortly after receiving the reports, Butell called a meeting between himself, Larson, Garcia, Hensley, and Woolsoncroft.[3] Dempsey was not included in the meeting. The City claims that, at the meeting, Butell asked for specifics, such as names of people and witnesses, so that charges could be filed against Rhea, but that Gar-

---

**2.** The contract paid Woolsoncroft's law enforcement training costs. In exchange, he was prevented from obtaining work at another law enforcement department for three years. Woolsoncroft became certified as a law enforcement officer in December 2000, after attending courses at the Kansas Law Enforcement Training Center (KLETC) in Hutchinson, Kansas.

**3.** The exact date that the meeting took place is unclear from the record. The court believes it occurred sometime between March 12, 2001, and early April 2001.

cia, Hensley and Woolsoncroft refused to reveal names or were not certain who was involved. The City also claims that during the meeting, Butell explained to the officers that Rhea recently had come to him explaining that Rhea needed time off to deal with personal problems, including his mother's health, his father's death, and his divorce. Since Rhea was already on a scheduled vacation, Butell told him to take time off, but told Rhea that he was not to return to work until he had a letter from a psychiatrist and a physician that would certify him as fit for full duty. Butell told the officers that they would have to get along with Rhea and work with him, but Rhea would not be back until he was certified as fit for duty.

Plaintiffs claim that the meeting was about patrol units and that they were told they had to get along with Rhea, but that nothing else was communicated.

Rhea was released back to full duty by his psychologist on April 17, 2001, and by his medical doctor on April 23, 2001, and returned to his duties as a police officer.

On May 18, 2001, Butell issued a memorandum to all officers stating that Triple I checks had to be approved either by "a supervisor, myself or Sgt. Larson." Officers not following the procedure were subject to discipline, including suspension or dismissal.

On May 22, 2001, a clerk at a Kwik Shop reported to Woolsoncroft that Rhea attempted to buy beer illegally after hours. On May 25, 2001, the clerk prepared a written statement and submitted it to Butell. Rhea disputed the clerk's statements. On June 1, 2001, Butell issued Rhea a verbal counseling and a written warning as a result of the incident.

On July 6, 2001, Rhea resigned from the Police Department. Rhea was never arrested or charged with engaging in criminal conduct.

## G. Investigation into the Reports about Rhea

Shortly before July 9, 2001, Butell and Larson learned that Woolsoncroft and Dempsey directly complained to Mayor Ken Hayes (Hayes) and an individual member of the Council about what they perceived as inaction taken with respect to Rhea. The City claims that plaintiffs sought out Hayes and various members of the Council to lodge complaints and that doing so ignored the Police Department's chain of command. Plaintiffs claim that the contact they had with Hayes and members of the Council regarding the complaints about Rhea was initiated by Hayes and/or members of the Council. Plaintiffs contend that they believed they were within the chain of command when they discussed the complaints with Hayes and members of the Council. None of the plaintiffs filed a grievance regarding Butell's and Larson's decisions and handling of the complaints about Rhea.

On July 9, 2001, the City's Administrator, Larry Paine (Paine), wrote a memorandum to all Police Department employees directing them to refrain from directly communicating with members of the Council. In the memorandum, Paine noted that the Council had asked him to instruct all members of the Police Department to "respect the chain of command," noting that "[t]he Mayor and City Council members do not want to be involved in issues that have not been brought through proper channels. Our Police Department policy manual has a description of chain of command and it has not been superseded." The City claims that the intent of the July 9, 2001 memorandum was not to prevent the officers from talking to members of the Council about matters other than police matters, but to emphasize that complaints about Police Department matters should

be brought through the City's grievance procedure.

In July 2001, in response to the apparent issues and conflicts within the Police Department, the Council commissioned an investigation of the entire Police Department by Mark L. Bennett, Jr., a Topeka attorney. The Council also hired two police chiefs from outside the City who served as police management consultants to work on internal cooperation among the members of the Police Department.

## H. Findings of the Bennett Report

Between July and September 2001, Bennett met with each member of the Police Department and prepared a detailed, written report of his interviews with the officers, as well as his findings and recommendations (the Bennett report). On September 24, 2001, Bennett submitted the Bennett report to the Council. The Bennett report concluded that many of Rhea's actions while he was a police officer for the City raised serious concerns about his ability to properly function as a police officer, and that Rhea's behavior should have concerned his supervisors more than it did.

The Bennett report also concluded that the Police Department should have conducted a more thorough investigation into plaintiffs' complaints about Rhea before permitting Rhea to return to full duty in April 2001. More specifically, the Bennett report found that Butell and Larson had not recognized Rhea's behavior, nor had they appropriately responded to and investigated the complaints about Rhea. The Bennett report also concluded that the Police Department was split between two factions—one comprised of plaintiffs and one comprised of Butell and Larson—and that the two factions were not capable of working together for the good of either the Police Department or the public.

In conjunction with the Bennett report, the City also received a report of an investigation by the Kansas Highway Patrol concerning use of the Triple I, in which it reported the use made of it by Rhea was inappropriate. As a result, the entire police force was prohibited from using the Triple I system for one month.

## I. Events Following the Bennett Report

On September 27, 2001, Dempsey received a written disciplinary notice for communicating with a member of the Council on both September 18 and 26, 2001, about Police Department matters, which the City claims was in direct violation of Paine's July 9, 2001 memorandum. Dempsey did not file a grievance regarding the September 27, 2001 discipline.

Between July 9, 2001, and October 1, 2001, plaintiffs hired legal counsel, who received permission to address the Council. On October 1, 2001, counsel for plaintiffs addressed the Council and discussed plaintiffs' reports to Bennett.

On October 2, 2001, Paine and Hayes issued a joint memorandum to all of the City's employees emphasizing the importance of understanding and using the grievance process. A copy of the grievance process was attached to the memorandum. In the memorandum, Paine and Hayes also reminded all employees to use the appropriate chain of command to raise job-related concerns instead of going directly to elected officials of the City.

On October 5, 2001, Paine issued a memorandum to Hayes, the Council, Butell, Larson, and each of the plaintiffs detailing efforts to address the issues within the Police Department. The memorandum also noted that a member of the Council had been appointed to chair a Public Safety Committee and to review the policies and procedures of the Police Department.

### J. December 2001 Discipline and Appeal Process

On December 7, 2001, Paine prepared Notices of Intent to Suspend (the Notices) and gave them to each of the plaintiffs, Butell, and Larson. Plaintiffs claim that Paine issued the discipline at Hayes' urging. Woolsoncroft's Notice stated that Paine intended to suspend him for one day without pay for failure to follow the Police Department Policies and the City's Rules and Regulations. The Notice explained that Woolsoncroft, among other things, failed to use the grievance procedure, improperly discussed internal police matters with members of the Council without informing Butell, ignored the chain of command and the July 9, 2001 memorandum regarding appropriate communication within the chain of command, and failed to timely report criminal behavior by another officer. Woolsoncroft's Notice also informed him of his right to appeal the suspension through the grievance procedure, but noted that any appeal would be heard by the Council instead of a grievance committee.[4]

Garcia's Notice also stated that Paine intended to suspend him for one day without pay for failure to follow the Police Department Policies and the City's Rules and Regulations. The Notice explained that Garcia had failed to appropriately use the grievance procedure, improperly discussed internal police matters with members of the Council without informing Butell, ignored the chain of command and the July 9, 2001 memorandum regarding appropriate communication within the chain of command, and failed to timely report criminal behavior by another officer.

The parties did not provide the court with Dempsey's or Hensley's Notices; however, the court believes that the language and proposed disciplinary action in them was similar to the other Notices, based on the Council's January 2002 written responses to the appeal.

On December 11, 2001, all of the officers who received the Notices, including plaintiffs, signed a memorandum to Paine indicating their desire to appeal the disciplinary action contained in the Notices.

On December 18, 2001, Paine notified the officers that their appeal would be heard by the Council as the final authority on grievances, instead of the smaller grievance committee, since Paine was normally the principal member of the grievance committee. On December 21, 2001, all of the officers participating in the appeal, including plaintiffs, signed a second memorandum to Paine confirming their desire to appeal the disciplinary action contained in the Notices and requesting that Paine recuse himself from the grievance committee and appoint a non-biased person to take his place. The officers indicated their intent to appeal the Notices directly to the Council if a restructured grievance committee was not possible.

On December 28, 2001, Paine informed all officers participating in the appeal that their request to have a restructured grievance committee hear the appeal was denied, and that the full Council would hear arguments from each officer who had received a Notice on January 7, 2002. Paine noted that the Council would rule on the appeal within three days after the hearing and that the Council's ruling would be final.

In a telephone conversation between Hayes and Dempsey on January 5, 2002[5],

---

4. The grievance committee normally included Paine as the City's Administrator.

5. Dempsey recorded the telephone conversation without Hayes' knowledge. The transcript of the recording was published March 27, 2002, in *The Baldwin City Signal.*

Hayes told Dempsey that the fundamental issue he saw in the Bennett report was that the Police Department lacked administrative control. Hayes said that to get Butell out of the Police Department, he had to "bring fire on all" of the Police Department. Hayes also told Dempsey that he wanted to issue written reprimands to the plaintiffs and Larson, and suspend Butell for five days. However, Hayes claimed that when he discussed the issue with the Council, at least three members said that if Hayes wanted to suspend Butell, he had to suspend all of the officers.

On January 7, 2002, the officers, including plaintiffs, individually presented their appeal of the December 7, 2001 disciplinary action to the Council. On the same day, the Council voted against a motion to release publicly a section of the Bennett report, despite Hayes' public urging that the Council do so.

### K. The January 2002 Appeal Decisions

On January 10, 2002, the Council issued written findings to each of the officers who had joined the appeal.[6] The Council found that Woolsoncroft engaged in misconduct in failing to timely make the report to his supervisors regarding Rhea's criminal behavior, including Rhea serving alcohol to minors. The Council found that Dempsey failed to appropriately manage subordinates, failed to recognize and respond to inappropriate behavior by Rhea, and failed to adequately investigate allegations of misconduct brought to his attention. The Council denied Dempsey's and Woolsoncroft's appeals and upheld their one-day, unpaid suspensions.

The Council found that Garcia engaged in misconduct by failing to timely report Rhea serving alcohol to minors at their apartment. Garcia received a written reprimand, but no suspension, as a result of the appeal. The Council found merit to Hensley's appeal, and rescinded the one-day, unpaid suspension. The Council informed Hensley that all references to the disciplinary action would be removed from his personnel file.[7]

The Council found that Larson failed to appropriately supervise subordinates, failed to recognize and respond to the issues with Rhea, and failed to adequately investigate the allegations of misconduct. As a result, the Council denied Larson's appeal and upheld her one-day, unpaid suspension. The Council found that Butell failed to adequately manage the Police Department, citing his failure to investigate misuse of the Triple I system, failure to inform Paine of personnel problems, failure to provide appropriate direction to his subordinates, and failure to appropriately investigate allegations of misconduct that were brought to his attention. The Council denied Butell's appeal and upheld his three-day, unpaid suspension.

### L. Other Alleged Retaliation

Plaintiffs contend that Hayes and Paine released information to the press about the Bennett investigation and disciplinary action taken by the City against members of the Police Department that was damaging to plaintiffs' reputations. The parties provided the court with various newspaper articles regarding the Police Department dating from November 2001 to March 2002. Included in the articles was an edi-

---

6. Although the written findings on the appeal were signed by Hayes on behalf of the Council, it is undisputed that Hayes did not vote when the Council made its determinations on the appeal.

7. The letter rescinding the disciplinary action remains in Hensley's personnel file.

torial by Hayes that was published in the *Baldwin City Signal* on December 24, 2001.

Plaintiffs also contend that the City engaged in retaliatory behavior as follows:

### 1. Hensley

Plaintiffs contend that Hensley's performance evaluation went from "good" to "poor" after the complaints about Rhea. At the time this Motion was fully briefed, Hensley was still employed by the Police Department.

### 2. Garcia

Plaintiffs claim that McKenna did not perform an employee evaluation on Garcia for 2003 as is required by Police Department policy. McKenna submitted an evaluation to the City that Garcia never saw or signed. Garcia had no opportunity to discuss the conclusions of the evaluation. Following the evaluation, the City made a very small increase in Garcia's pay without explanation. Plaintiffs claim that when Garcia checked the City's records of raises for that year, he discovered that other Police Department employees who were newly hired or who had little education or experience received higher raises than he did, some up to five percent. Garcia and Hensley received only 35 cent per hour raises. Plaintiffs contend that McKenna's failure to timely evaluate Garcia, and McKenna's subsequent failure to reveal Garcia's evaluation were out of retaliation for the public safety concerns Garcia raised about Rhea.[8] At the time this Motion was fully briefed, Garcia was still employed by the Police Department.

### 3. Woolsoncroft

Plaintiffs contend that Woolsoncroft's police vehicle was defective and that bolts on the steering wheel of his police car were tampered with after the reports about Rhea.

On March 6, 2002, Butell placed Woolsoncroft on six months' probation. Woolsoncroft regards the issues leading to the probation as minor infractions. The City claims the probation was to assist Woolsoncroft in correcting his attitude and performance after the City received a number of citizen complaints about Woolsoncroft's conduct, to which Woolsoncroft admitted, and after the Assistant District Attorney for the Douglas County District Court complained to Butell about Woolsoncroft's allegedly disrespectful and unprofessional manner before a local judge. Woolsoncroft appealed the March 6, 2002 probation through the grievance procedure, but the probation was affirmed.

On September 18, 2002, Larson and Dempsey issued Woolsoncroft a written reprimand and a three-day suspension for failure to follow Police Department Policies. Larson, the acting Chief of Police at that time, notified Woolsoncroft on October 15, 2002, that his employment was being terminated, effective October 4, 2002. Woolsoncroft grieved his termination of employment, but on October 21, 2002, the Council upheld the termination.

After his termination of employment, Woolsoncroft wrote a letter to Paine accusing him of depriving Woolsoncroft of employment with the City of Shawnee as a police officer. The City contends that Paine learned that Butell had submitted

---

**8.** Plaintiffs also contend that the evaluation and small raise were in retaliation for Garcia's expressed concerns that the Police Department's training firing range was being run in violation of Kansas statutes protecting the safe use of firearms in police training and

certification. However, such reason for retaliation was not raised in plaintiffs' complaint and is not a part of the Pretrial Order. The court thus does not consider this allegation an aspect of plaintiffs' claims before this court.

Woolsoncroft's personnel file to a representative of the City of Shawnee for inspection when it was considering Woolsoncroft for employment. However, Butell withdrew from Woolsoncroft's personnel file all of the documents showing disciplinary action against Woolsoncroft prior to making the file available for inspection. Paine called the City of Shawnee and told them they were given an incomplete file to inspect. Paine offered the City of Shawnee the opportunity to inspect the entire file, but it never did so. Woolsoncroft was not offered employment with the City of Shawnee.

### 4. Dempsey

Plaintiffs claim that, following the complaints about Rhea, Dempsey's previously approved vacation was cancelled in retaliation for the complaints. The City contends that Dempsey's vacation was requested, but never approved, and that the Police Department allowed Dempsey to use vacation time as staffing permitted after Rhea resigned.

Plaintiffs also claim that when McKenna became Chief of Police, he demoted Dempsey from his position as a detective to that of patrol officer and moved Dempsey from the day shift to the night shift to prevent him from participating on a major · case squad and as punishment for not resigning from his position with the Police Department. The City claims that Dempsey was never made a detective, but was a corporal, which, according to the Police Department Policies, was as high a rank as a detective. The City claims that Dempsey remained a supervisor after McKenna became Chief, and that Dempsey was reassigned to the night shift due to staffing needs. The City further contends that

McKenna was not aware of the issues with the plaintiffs over the reports regarding Rhea, and that those issues did not affect McKenna's treatment of plaintiffs when he became Chief of Police.[9]

Plaintiffs also claim that McKenna suggested that Dempsey have a physical examination to determine whether he was fit for duty after Dempsey had a non-work-related accident at home that injured both of his shoulders. Dempsey was released to full duty and returned to work after the accident.

Dempsey's employment was terminated in July 2003. Apparently, after McKenna became Chief of Police, he took fingerprints of every employee at the Police Department and conducted background checks through the Federal Bureau of Investigation (FBI). Dempsey's background check revealed that he had been convicted of a felony in the state of California in 1964. McKenna believed that, because of the conviction, under Kan. Stat Ann. §§ 74–5605 and 5607a, Dempsey could not legally. serve as a law enforcement officer in Kansas. As a result, on June 10, 2003, McKenna placed Dempsey on suspension with pay, with termination to be effective in 21 days from the date of the suspension unless Dempsey used the grievance procedure to show why his employment should not be terminated. The City claims that McKenna knew nothing of any prior speech for which Dempsey claimed constitutional protection at the time McKenna suspended Dempsey with notice that his employment was to be terminated, and that Dempsey was subjected to the same background check as all other employees.

Plaintiffs claim that McKenna ignored the restrictions on use of the FBI back-

---

9. McKenna was sworn in as Chief of Police on December 16, 2002. He observed that there was a split in the Police Department, but although he talked to each member of the Police Department individually and collectively about the problems, he claims he did not ever learn the source of the split.

ground check form, and that Dempsey was not provided the opportunity to challenge the reported information as is required by 28 C.F.R. § 16.34.[10] Plaintiffs further contend that the report from the FBI did not reflect that the felony charge against Dempsey was dismissed and vacated on January 18, 1973. Plaintiffs claim that Dempsey advised McKenna that the conviction had been dismissed in 1973 but that McKenna proceeded with the termination of his employment anyway.

Dempsey originally appealed his termination of employment through the City's grievance procedure and requested time to acquire the records showing the dismissal of the criminal charge. However, in a July 21, 2003 letter, Dempsey withdrew his appeal of the termination because he had been unable to obtain the records showing the dismissal of the charge against him.[11]

### III. Discussion

#### A. 42 U.S.C. § 1983 Claims

##### 1. Nature of the Claims

█ Plaintiffs assert a cause of action against the City for actions primarily taken by Hayes, but also by Paine, Butell and McKenna, in their official capacities, pursuant to 42 U.S.C. § 1983. Section 1983 provides a remedy for deprivations of rights secured by the Constitution and laws of the United States when that deprivation takes place "under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory." *Lugar v.*

*Edmondson Oil Co.,* 457 U.S. 922, 924, 102 S.Ct. 2744, 73 L.Ed.2d 482 (1982).

Plaintiffs' § 1983 claims are brought pursuant to the First and the Fourteenth Amendments to the United States Constitution. Plaintiffs claim that Hayes initiated and directed retaliation against them for engaging in speech protected by the First Amendment—namely plaintiffs' complaints about Rhea and criticism of the Police Department's response to the complaints. Plaintiffs claim that Hayes' retaliation manifested itself in three ways: 1) express criticism of the protected speech and such speech being forbidden by Paine in written memorandums; 2) the December 2001 disciplinary Notices and changes in working conditions at the Police Department after the speech occurred; and 3) eventual termination of employment of both Woolsoncroft and Dempsey.

Plaintiffs' Fourteenth Amendment claims appear to be brought in three ways: 1) reputation of all plaintiffs damaged during the disciplinary and appeal process in December 2001/January 2002; 2) Woolsoncroft's and Dempsey's property interest in employment violated because of their allegedly unlawful and pretextual terminations of employment; and 3) due process rights of all plaintiffs violated by the January 2002 appeal of the December 2001 disciplinary Notices. Plaintiffs' Fourteenth Amendment claims also appear to arise from the allegedly retaliatory behavior directed by Hayes.

10. To the extent plaintiffs are alleging an additional cause of action, the court declines to address it herein. Such a claim was not a part of plaintiffs' Complaint or the Pretrial Order.

11. Following the briefing of the Motion for Summary Judgment, plaintiffs submitted documents to the court demonstrating that the Kansas Law Enforcement Commission has determined that Dempsey was, at all times

relevant, qualified to be a law enforcement officer under Kansas law. However, the court notes that that determination was not issued until well after the summary judgment briefing was complete and was not made at the time McKenna made the decision to terminate Dempsey's employment. The information submitted by plaintiffs has no bearing on the facts known to the parties at the time the termination decision was made.

## 2. Municipal Liability Under § 1983

 Plaintiffs bring their § 1983 claims directly against the City; plaintiffs have abandoned claims against Hayes, Paine, and the Council in their official capacities. The City will be liable under § 1983 if an official custom or policy caused a violation of plaintiffs' constitutional rights, *see Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 692, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978); *Kentucky v. Graham*, 473 U.S. 159, 165, 105 S.Ct. 3099, 87 L.Ed.2d 114 (1985), or if an individual with final policymaking authority violated plaintiffs' constitutional rights. *See Pembaur v. City of Cincinnati*, 475 U.S. 469, 481–84, 106 S.Ct. 1292, 89 L.Ed.2d 452 (finding that decision by official responsible for establishing final policy may give rise to municipal liability); *Ledbetter v. City of Topeka, Kan.*, 318 F.3d 1183, 1189 (10th Cir.2003). Local government cannot be held liable for injury inflicted solely by its employees on the theory of *respondeat superior*. *Monell*, 436 U.S. at 694, 98 S.Ct. 2018.

Plaintiffs do not argue that an official custom or policy caused a violation of their rights; rather, plaintiffs claim that predominantly Hayes, but also Paine, Butell, and McKenna, took retaliatory action in their official capacities that violated plaintiffs' constitutional rights. Plaintiffs argue that Hayes was the final policymaking authority for the City and that Hayes' political motivations and retaliatory intentions toward plaintiffs were advanced by Paine's, Butell's, and McKenna's loyalty to Hayes. The City contends that only the Council had final policymaking authority.[12]

## a. Standard for Final Policymaking Authority

 Final policymaking authority is a legal issue for the court to determine under state and local law. *City of St. Louis v. Praprotnik*, 485 U.S. 112, 123, 108 S.Ct. 915, 99 L.Ed.2d 107 (1988). In *Praprotnik*, the Supreme Court set forth two factors that guide the court in resolving this issue: "1) whether a subordinate's discretionary decisions are constrained by general policies enacted by others; and 2) whether the subordinate's specific decisions are reviewable by others." *Id.* at 127, 108 S.Ct. 915.

Following *Praprotnik*, the Tenth Circuit has articulated three elements for the court to use in determining whether an individual is a final policymaker: 1) whether the individual is meaningfully constrained "by policies not of that official's own making;" 2) whether the official's decisions are subject to any meaningful review; and 3) whether the policy decision allegedly made by that official is within the official's grant of authority. *Randle v. City of Aurora*, 69 F.3d 441, 448 (10th Cir.1995) (citing *Praprotnik*, 485 U.S. at 127, 108 S.Ct. 915 and *Ware v. Unified Sch. Dist. No. 492, Butler Cty., State of Kan.*, 902 F.2d 815, 818 (10th Cir.1990)).

 To determine whether an individual holds final policymaking authority, the court examines the legal chain of authority. *See Jantz v. Muci*, 976 F.2d 623, 631 (10th Cir.1992); *Ware*, 902 F.2d at 819. An official is not a policymaker simply because he has discretionary authority to carry out functions authorized by municipal policy. A policymaker must have final authority to establish policy. *Praprotnik*,

---

12. The court notes that the parties, in their summary judgment briefing, only summarily addressed the municipal liability issue, but clearly disagreed as to who had final policymaking authority. Because the only remaining defendant is the City, the court finds the municipal liability determination a crucial threshold issue to be determined before addressing the merits of plaintiff's First and Fourteenth Amendment claims.

485 U.S. at 125–128, 108 S.Ct. 915. Thus, an official whose actions can be reviewed by other policymakers or who is constrained by the policies of others does not have final policymaking authority. *Id.*

■■■■■ Moreover, although the City is liable for the actions of employees who have final policymaking authority, the City will not be liable simply because an employee or agent of the City exercises discretionary authority granted to it by a municipal policy. *Id.* It is the municipal policy itself, not the discretionary actions of an official pursuant to a policy, that is considered the act of the municipality. *Id.* "Simply going along with discretionary decisions made by one's subordinates, however, is not a delegation to them of the authority to make policy." Likewise, "the mere failure to investigate the basis of a subordinate's discretionary decisions does not amount to a delegation of policymaking authority." *Id.* at 130–31, 108 S.Ct. 915.

■■■■■ However, the City may be liable for the actions of an official who does not have final policymaking authority through a theory of ratification. To do so, plaintiffs "must allege more than mere acquiescence by a final policymaker in a subordinate's actions." *Patrick v. City of Overland Park, Kan.,* 937 F.Supp. 1491, 1501 (D.Kan.1996) (citing *Feliciano v. City of Cleveland,* 988 F.2d 649, 656 (6th Cir. 1993)). Plaintiffs must allege and prove that the final policymaker affirmatively approved a subordinate's decision *and the basis for it. Praprotnik,* 485 U.S. at 127, 108 S.Ct. 915 (emphasis added). Then, plaintiffs would have to prove that the ratification was a "moving force" in causing the constitutional violation. *Williams v. Ellington,* 936 F.2d 881 (6th Cir.1991).

#### b. The City's Final Policymaking Authority

■■■■ The facts before the court establish that the Council is the final policymak-ing authority for the City on personnel decisions. Pursuant to the City's Rules and Regulations—adopted as City ordinance—various officials in the City, including the Mayor, the City Administrator, and the Chief of Police, may make personnel decisions. However, all such decisions are subject to the City's grievance procedure and ultimately are subject to review and approval by the Council. It appears from the record that the Council retained its authority to make final personnel decisions, and that it actively participated in grievance hearings and review of personnel decisions made by subordinate department heads. Hayes could only vote on a matter before the Council if there was a tie, which, according to the record, did not occur in this case.

Conversely, the court does not believe that Hayes, Paine, Butell, or McKenna were final policymakers for the City on personnel matters. While Butell (and subsequently McKenna) was given discretionary authority to establish Police Department Policies and to control the day-to-day workings of the Police Department, such authority was specifically governed by the City's Rules and Regulations and subject to the review of the Mayor, City Administrator, and ultimately the Council. Likewise, Hayes and Paine were given discretionary authority to supervise the City's employees and to discipline and suspend employees, subject to the review of the Council. Because the court believes that the Council conducted meaningful reviews of personnel decisions, the court does not believe any of those individuals had final policymaking authority.

#### c. Link Between A Policy or a Final Policymaker and the Alleged Constitutional Violations

As the court noted above, plaintiffs have identified no unconstitutional policy of the

City. Instead, plaintiffs claim that Hayes initiated and directed the alleged retaliation and due process violations against them in furtherance of his own political agenda, misinforming and misleading the Council along the way. Plaintiffs contend that because they were politically neutral, they became victims of Hayes' ambitions.

However, "even if one assumes that all this was true, it says nothing about the actions of those whom the law established as the makers of municipal policy in matters of personnel administration." *Praprotnik*, 485 U.S. at 128, 108 S.Ct. 915. The City had no ordinance or personnel rule designed to retaliate against plaintiffs or prevent them from voicing concerns about the management of the Police Department. Rather, the City had an established grievance procedure and appeal process to review disputed personnel decisions and complaints regarding conditions of employment, through the Council—the final policymaking authority for the City on personnel decisions. In essence, plaintiffs have misdirected their arguments towards whether retaliatory and unconstitutional acts occurred, which is a separate and distinct consideration from whether such acts were committed by Hayes and other officials of the City as final policymakers.

In response to plaintiffs' complaints about Rhea, concerns about the management of the Police Department, and observation of the apparent conflict within the Police Department by July 2001, the Council commissioned an independent investigation into the problems, which resulted in the Bennett report. Following the issuance of the Bennett report, Hayes, through Paine, initiated disciplinary action against plaintiffs, Larson and Butell. Plaintiffs do not deny that they were permitted the opportunity to appeal directly to the Council the disciplinary actions taken against them. Despite the fact that Hayes may have attempted to influence the Council's vote on the appeal, it is uncontroverted that Hayes did not vote on the appeal decisions.

Moreover, the record demonstrates that the Council did not blindly follow Hayes' direction in making personnel decisions. For example, the Council voted not to publicly release the Bennett report despite Hayes' pressure to do so and his criticism through the local news media when the Council refused to do so. The Council also independently reviewed and made its decisions on the appeals of the December 2001 discipline, overturning the discipline issued to Hensley, and reducing the discipline issued to Garcia, despite Hayes' involvement in the process.

In fact, all of the personnel decisions questioned by plaintiffs were grievable and appealable to the Council as the final policymaking authority on personnel decisions. In reviewing the December 2001 discipline, the Council had the benefit of the independently commissioned Bennett report in reaching its decisions. Moreover, in each instance that one or more plaintiffs appealed a personnel decision, the Council provided them notice of a time and place to be heard and issued written decisions on the appeals.[13]

Plaintiffs have offered no record support, other than their own self-serving statements, to suggest that the appeal process through the grievance procedure was

**13.** The court notes that, although plaintiffs claim they are still confused regarding the reasons for the January 2002 decisions by the Council on the appeal of the disciplinary Notices, the reasons for the Council's decisions were clearly set forth in the written decisions.

The January 2002 decisions directly address what the Council found to be Woolsoncroft's and Garcia's lack of timely communication about problems with Rhea, and Dempsey's failure to appropriately supervise subordinates.

not meaningful, or that the Council simply ratified subordinate's personnel decisions and the basis for them—much less that the Council's alleged ratification of the personnel decisions was a "moving force" in causing the alleged constitutional violations. As a result, the court finds that the purposes of § 1983 would not be served by treating Hayes' (and Paine's, Butell's, and McKenna's) actions and allegedly retaliatory motives as if they were a reflection of the City's policies. *See Jantz,* 976 F.2d at 631 (school board not liable for principal's action because school board had ultimate legal authority to review decisions involving hiring and firing); *Ware,* 902 F.2d at 819 (municipality not liable because principal who fired plaintiff was not final policymaker on personnel matters and his decisions were reviewed by the school board). Accordingly, the City is entitled to summary judgment on plaintiffs' § 1983 claims.[14]

**B. State Law Defamation Claim**

The court may, in its discretion, exercise supplemental jurisdiction over plaintiffs' state law defamation claim if it is sufficiently related to a pending claim over which the court has original jurisdiction. *See* 28 U.S.C. § 1367(a). Plaintiffs asserted § 1983 claims over which this court has original jurisdiction under 28 U.S.C. § 1331.

However, the court need not exercise supplemental jurisdiction and may decline to do so under § 1367(c) if the court "has dismissed all claims over which it has original jurisdiction." 28 U.S.C. § 1367(c). Here, the court has dismissed plaintiffs' § 1983 claims, over which it had original jurisdiction. Consequently, this court, in its discretion, declines to exercise supple-

mental jurisdiction over defendant's state law defamation claim and hereby dismisses it without prejudice.

**C. Injunctive Relief**

In light of the court's grant of summary judgment to defendant on plaintiffs' § 1983 claims, the court grants the City's motion for summary judgment regarding plaintiffs' request for injunctive relief. In the absence of plaintiffs' constitutional claims, the request for injunctive relief becomes moot.

**IT IS THEREFORE ORDERED** that defendant's Motion for Summary Judgment (Doc. 53) is granted.

**IT IS FURTHER ORDERED** that this case is hereby dismissed.

---

**14.** Because the court finds that Hayes, Paine, Butell and McKenna, who took the allegedly retaliatory and unconstitutional actions towards plaintiffs, were not final policymakers, and none of those individuals remain as defendants, the court does not reach the legal merits of plaintiffs' First and Fourteenth Amendment claims.